

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA

-against-

JERMAINE JACOB ANTHONY,

                            Defendant.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

**09-CR-557 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Jermaine Jacob Anthony ("Anthony") is charged in a two-count indictment with importation of cocaine, in violation of 21 U.S.C. § 952(a), and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). (Indictment (Docket Entry # 17).) Anthony was arrested and interrogated at John F. Kennedy International Airport ("JFK") in Queens, New York. Anthony moves to suppress statements that he made while in custody at JFK. (Docket Entry # 26.) For the following reasons, Anthony's motion is denied.

**I.    BACKGROUND**

On January 6, 2009, Anthony took a Caribbean Airlines flight from Georgetown, Guyana to JFK. (Anthony Decl. (Docket Entry # 26) ¶ 2.) Upon arrival, Customs and Border Protection Officers selected Anthony for a customs inspection. (Id.) While searching his luggage, officers discovered two cookbooks filled with cocaine. (Id.) The officers then handcuffed Anthony and escorted him to a search room within JFK's terminal. (Id. ¶¶ 3-4.) Beyond this, the parties' accounts of the events that transpired significantly differ.

**A.    Anthony's Version**

Anthony claims that while Customs and Border Protection Officers escorted him to the search room, he "started to tell the officers that the books did not belong to [him] and that" a

1

friend gave them to him. (Id. ¶ 3.) One of the officers responded, "'no one is going to believe that' and that [he] should tell that to 'the guys who are going to question [him].'" (Id.) The officers then handcuffed Anthony to a bench in the search room. (Id. ¶ 4.) Although one of the officers advised him of his right to remain silent, neither officer advised him of his right to an attorney. (Id.) The two officers then left the room and closed the door. (Id.)

Approximately ten minutes later, four different officers, including one heavy-set officer with a grey beard, entered the room. (Id. ¶ 4-5.) Anthony claims that one of the officers examined his cell phone and made comments to another officer inside the room, a third officer stood just inside the doorway, and the fourth stood just outside the doorway. (Id. ¶ 5.) One of the officers told him "not to lie" in a "very aggressive tone," told him that he faced "ten to twenty years" imprisonment, and asked him to explain "exactly what happened." (Id.) As he began to answer, one of the officers made comments in an aggressive tone about "bodies lying in the streets of Guyana [filled] with drugs, how can you tell us you don't know." (Id. ¶ 6.) One of the officers then asked him "how much [he] got paid for carrying the books." (Id.) When he tried to explain that he did not receive any compensation for carrying the books, the officer "said words to the effect of 'you can't give me that.'" (Id.) During the interrogation, Anthony claims that the officers denied him permission to make a phone call. (Id.) And when he asked permission to use the bathroom, one of the officers escorted him to the bathroom, stripped and searched him, and took his belt, shoe laces, jacket and sweater. (Id.) The officer refused to return his sweater and jacket even though he told the officer that he was cold. (Id.)

Following the strip search, Anthony claims that he was brought to another room, where the same officer who had already questioned him, read him his Miranda rights, including his right to an attorney. The officer then handed him a piece of paper and told him to sign it, even

though Anthony alerted the officer that he "could not read very well." (Id. ¶ 7.) The officer then repeated the same questions that he had asked in the first interview. (Id.) Anthony again explained what happened. (Id.)

**B.     The Government's Version**

Upon his arrival at JFK, Customs and Border Protection Officer Christopher Elias selected Anthony for a border inspection. (Gov't Opposition (Docket Entry # 27) 2.) In response to Officer Elias's questions, Anthony confirmed in English that the suitcase containing the cookbooks and all its contents belonged to him. (Id.) After discovering a white, powdery substance in the cookbooks, Officer Elias and Customs and Border Protection Officer Jazylo escorted Anthony to a search room. (Id.) Officer Elias "field-tested" the substance, which tested positive for cocaine. (Id.) The officers then handcuffed Anthony and notified Immigration and Customs Enforcement ("ICE") of the arrest. (Id.)

Around 11:00 p.m., Agent Magilton and his team, including Agents Gaudioso, Cerciello, and Kim, responded to Anthony's location. (Suppression Hearing Jun. 28, 2010 Transcript ("Tr.") 5-6, 9, 12.). They took Anthony into their custody at 11:04 p.m. (Gov't Ex. 2; Tr. 42.) Although Agent Magilton did not know how long Anthony was in custody with Customs and Border Protection before his arrival, he estimated that it was about an hour. (Tr. 26-27.) Before questioning Anthony, Agent Magilton asked Officer Elias for any information he had about Anthony. (Tr. 20.) Officer Elias responded that he had discovered narcotics in Anthony's luggage and that Anthony had arrived from Guyana following a three-week stay for his wedding. (Tr. 20, 25.) Agent Magilton testified that he could not recall what, if any, questions Officer Elias asked Anthony, or whether Officer Elias questioned Anthony before or after he was handcuffed, or whether Officer Elias personally advised Anthony of his Miranda rights. (Tr. 23-

3

24, 27-28.) Agent Magilton understood, however, that Anthony had not yet been advised of his Miranda rights. (Tr. 24.)

At first, only Agents Magilton and Cerciello entered the room where Anthony was being held; eventually Agents Gaudioso and Kim entered the room for some of the interview. (Tr. 6, 9, 12; Gov't Opposition 3.) Upon entering the room, Agent Magilton identified himself and Agent Cerciello. (Tr. 7.) Agent Magilton told Anthony that he wanted to speak with him, but had to read him his rights first. (Tr. 7, 35.) Agent Magilton then read Anthony his Miranda rights from a "Miranda card" that he maintained in his credential case.[1] (See Tr. 7-8; Gov't. Ex. 1.) Although Agent Magilton had difficulty understanding Anthony's "Caribbean" accent, he believed that Anthony understood him because Anthony responded to his specific questions in English and because Anthony did not indicate that he could not understand him. (Tr. 8-10.) After hearing his rights, Anthony verbally agreed to waive them. (Tr. 8-9.)

Agent Magilton then began asking Anthony general questions about what had happened and why he travelled to Guyana. (Tr. 37-38.) In response, Anthony provided a "complete" account of what had occurred and how he came to possess the cookbooks. (Tr. 38.) Agent Magilton first questioned Anthony in a conversational tone, but raised his voice, without yelling, when he thought that Anthony was not being truthful. (Tr. 10.) Agent Magilton also openly discussed with the other agents in the room that he did not believe that Anthony was being truthful. (Tr. 44.) During the interview, Agent Magilton also explained to Anthony that he faced a mandatory minimum sentence of five years imprisonment for possessing the narcotics

---

[1] The Miranda card included the following warnings: "You have the right to remain silent"; "Anything you say can be used against you in court"; "You have the right to consult with an attorney and to have them present during questioning"; "If you can not afford an attorney, one will be appointed to represent you prior to any questioning." (Gov't Ex. 1.)

4

discovered in his luggage. (Tr. 11.) Agent Magilton further explained that he would inform the Assistant U.S. Attorney if Anthony cooperated, which could lead to a reduced sentence. (Id.)

The interview lasted approximately fifteen minutes. (Tr. 13.) At one point during the interview, Agent Magilton "stuck [his] head out" of the room for about thirty seconds while Agents Cerciello and Kim remained in the room. (Tr. 39.) During the interview, Anthony neither requested an attorney, nor asked the Agents to cease questioning. (Tr. 11.) According to Agent Magilton, Anthony never asked to use the bathroom or the telephone. (Tr. 11-12.) He also did not recall that any of the officers told Anthony that there were bodies lying in the streets of Guyana or that he faced ten to twenty years imprisonment. (Tr. 34-35, 39.) And, according to Agent Magilton, neither he, nor any of the other officers threatened Anthony. (Tr. 10, 17.)

After completing the interview, Agent Magilton and several other agents escorted Anthony to another office, a few hundred yards away. While Agent Magilton went to retrieve a "Statement of Rights form," the other agents brought Anthony to an interview room, but Agent Magilton did not know whether the other agents briefly placed Anthony in a holding cell first. (Tr. 13, 41.) Only Agent Magilton and Agent Gaudioso were in the room with Anthony during the second interview. (Tr. 14, 18, 47.) Before questioning Anthony again, Agent Magilton advised Anthony of his Miranda rights by reading the "Statement of Rights form." (Tr. 13-14; Gov't Ex. 2.) He then gave the form to Anthony to read. (Tr. 13-14.) According to Agent Magilton, Anthony stated that he understood the form, (Tr. 15-16), and did not indicate that he had poor reading skills, (Tr. 45-46). Anthony signed a waiver of rights at the bottom of the form; Agents Magilton and Gaudioso signed the form as witnesses.[2] (Gov't Ex. 2.) Agent Magilton then proceeded to interview Anthony again, during which time he again raised his

---

[2] The waiver states that "I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity . . . ." (Gov't Ex. 2.)

5

voice, but did not yell, because he believed that Anthony was not being honest. (Tr. 17.) The second interview lasted for approximately fifteen to twenty minutes. During this time, Anthony never requested an attorney, asked that the agents to cease questioning, or asked permission to use the bathroom or telephone. (Tr. 17-18.)

## II. DISCUSSION

After observing Agent Magilton's demeanor and ability to respond to questions on direct and cross-examination, the court finds that his testimony is credible as to all matters it addressed. Anthony did not testify; his affidavit is the only evidence that could establish his version of events—he submitted no corroborating evidence. The court, therefore, credits Agent Magilton's testimony where it conflicts with Anthony's affidavit. For the purposes of this motion, the court accepts Anthony's affidavit as true where it is consistent with Agent Magilton's testimony or where it addresses facts outside the scope of Agent Magilton's testimony.

### A. Applicable Law

"Prior to any questioning, [a defendant] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Because "courts must presume that a defendant did not waive [these] rights," North Carolina v. Butler, 441 U.S. 369, 373 (1979), the government may only use "statements made by a suspect under custodial interrogation [if]: (1) the suspect has been apprised of his Fifth Amendment rights; and (2) the suspect knowingly, intelligently, and voluntarily waived those rights." United States v. Plugh, 576 F.3d 135, 140 (2d Cir. 2009).

To show a valid waiver, the government must prove by a preponderance of the evidence: "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant

6

had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). A waiver may be implied from "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver"—based on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." See Butler, 441 U.S. at 373-4 (internal quotation marks omitted). When there "is no contention that [the defendant] did not understand his rights . . . it follows that he knew what he gave up when he spoke." Berghuis v. Thompkins, — U.S. —, 2010 WL 2160784, at *11 (Jun. 1, 2010); see also United States v. Silva, 715 F.2d 43, 46 (2d Cir. 1983) (finding that the defendant understood her rights when she indicated she understood them, had no questions, and answered questions posed to her in English).

### B. Application

Anthony moves to suppress his statements obtained in violation of Miranda based on the conduct of the interrogating officers and based on the failure of his arresting officers to advise him of his right to counsel. He does not specify which statements in particular he seeks to suppress. The facts, however, suggest three groups of statements that the Government could potentially have obtained in violation of Miranda: (1) statements that Anthony made to Customs and Border Patrol officers before his first interrogation by ICE agents, (2) statements that Anthony made to ICE agents during his first interrogation, and (3) statements made to ICE agents during his second interrogation. In light of Agent Magilton's testimony, and as discussed below, these groups can be categorized as pre and post-Miranda statements.

1.  Post-Miranda Statements

The court finds, by a preponderance of the evidence, that Agent Magilton advised Anthony of all his Miranda rights before his first interrogation, and again, before his second interrogation. The court credits Agent Magilton's testimony that, before asking any questions in the first interrogation, he read Anthony all of Miranda's required warnings from his Miranda card, including the right to counsel. And before the second interrogation, the court finds—and Anthony does not dispute—that Agent Magilton read Anthony his Miranda rights from the Statement of Rights form and that Anthony read and signed the form.

The court further finds that Anthony validly waived his rights after each time that he was advised of them. First, Anthony verbally waived his rights before any interrogation in the first interview; and before the second interview, Anthony signed a waiver on the Statement of Rights form. Second, the record shows that Anthony understood his rights and the consequences of waiving them. Agent Magilton testified that Anthony provided responsive answers, in English, to his specific questions; that Anthony did not indicate at any time indicate that he could not understand either his rights or Agent Magilton's questions; and that Anthony never expressed any difficulty reading the Statement of Rights form. The waiver that Anthony signed also states that he understood his rights.

Finally, the court finds that neither Agent Magilton's team nor the Customs and Border Patrol officers coerced Anthony's statements. A statement is obtained by coercion if it was "brought about by circumstances that caused the [defendant]'s will to be overborne at the time he confessed." Green v. Scully, 850 F.2d 894, 900 (2d Cir. 1988). Anthony does not claim that Customs and Border Patrol agents coerced him into making any statements before Agent Magilton's team took him into custody. But Anthony's affidavit suggests that he believes that

Agent Magilton's team coerced him into making statements (1) by denying him permission to use the bathroom or telephone; (2) by aggressively stating that bodies are laying in the streets of Guyana filled with drugs; (3) by strip searching him and withholding his jacket and sweater, despite stating that he was cold; and (4) by telling him that he faced ten to twenty years imprisonment. Agent Magilton, however, testified that Anthony never sought to use the bathroom or telephone, that no agent discussed bodies in the streets of Guyana, and that he only told Anthony that his offense carried a minimum sentence of five years imprisonment.

In light of Agent Magilton's credible testimony, Anthony's contentions regarding coercion fail. Agent Magilton's testimony forecloses a finding that the first two occurred. Regarding the third contention, discussing a five year term of imprisonment in the circumstances of this case did not constitute coercion. See United States v. Bye, 919 F.2d 6, 9 (2d Cir. 1990) (noting that "nothing improper about a defendant being told by federal agents that he faced heavy penalties'"). Finally, Anthony's claim that agents stripped and searched him and withheld his winter clothing despite being cold, even if true, does not support a finding that his statements were made involuntarily in the totality of the circumstances. Following the incident, and before making any further statements in response to Agent Magilton's questions, Anthony retained the choice about continuing to speak. He read a statement of his rights and signed a waiver before he proceeded to answer any further questions.

2. Pre-Miranda Statements

The Government does not contend that it advised Anthony of his Miranda rights before ICE took him into custody. The record only indicates that Officer Elias ascertained some information about Anthony before ICE took him into custody—Agent Magilton testified that Officer Elias conveyed that Anthony had arrived from Guyana following a three-week stay for

9

his wedding. But the record does not indicate that Officer Elias asked Anthony any questions, and if he did, whether he asked them before or after placing Anthony under arrest. Anthony only claims that he spontaneously told his arresting officers that the cookbooks did not belong to him. He does not assert that he was subjected to a custodial interrogation before the ICE agents questioned him; nor does he indicate what, if any statements, he made to Customs and Border Protection officers that should be suppressed.

Under these facts, Anthony's motion to suppress statements that he made before he was advised of his rights is denied. Not all statements made to police trigger Miranda's requirements. "Miranda warnings need not be given to one detained at the border and subjected to a routine customs inquiry." Silva, 715 F.2d at 46. And "[v]olunteered statements of any kind are not barred by the Fifth Amendment and, thus, do not require preliminary advice of rights." United States v. Rommy, 506 F.3d 108, 132 (2d Cir. 2007) (internal quotation marks omitted). Because Anthony does not claim that he was subjected to custodial interrogation before having been advised of his Miranda rights, his motion to suppress is denied with respect to any pre-Miranda statements. The statements that Anthony claims to have volunteered to his arresting officers and any statements made in response to routine customs inquiry are outside the scope of Miranda's requirements.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is denied.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
July 21, 2010

NICHOLAS G. GARAUFIS
United States District Judge